The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons have in any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. McGuire Financial v. Powersecure, Mr. Piven, happy to hear from you. Thank you, Your Honor. Charles Piven appearing on behalf of the appellant. May it please the Court. One thing defendants knew for sure before the class period was the present or historical fact that the large Florida Power and Light contract announced in June 2013 was in a geographic location far from the location of the old contract, and Powersecure would have to start over to service that contract. Mr. Hinton knew before the class period what he admitted at the end, that what the defendants characterized as a renewal was actually, quote, like having a contract in California that serves San Francisco and then you win a damn contract in Los Angeles. The words renewed or renewal were used by defendants six times on purpose, four times in writing and two times orally. But whether it was on purpose or not, it was the defendants intention to deprive investors of material information that would allow them to assess their investment decision. What was the material information that they allegedly deprived investors of? That the contract was across the state and that starting from scratch would substantially delay the efficiency in servicing the new contract and that it would hit the company's bottom line, which is exactly what happened, Your Honor. Didn't the company in the weeks and months preceding this telegraph that they were having increased costs and issues even before, even outside of this renewed or new contract? They did. And so what that would be would be an attempt at a truth on the market defense, Your Honor, and that does not meet the burden of a truth on the market. The point is quite right. I mean, with Sienta, you have to prove either knowing or reckless attempt to deceive. And it is certainly relevant that during the class period, the company repeatedly disclosed increased operating expenses and declining gross profit margins. And if they were out on some campaign of deception, it is at least relevant to Sienta that they're reporting some adverse news. The law, Your Honor, is that if you're going to give that kind of general information, it has to have the degree of intensity sufficient to counterbalance any misleading impression created by their misrepresentation and omissions. I think the question focuses a little more concretely on the Sienta component. And you said something very interesting, and I was trying to make note of it, and it got away from me. You said whether deliberately or not, or words of that, did you say that, whether deliberately or not? That's right, because — And if it's not deliberate, how does it manifest Sienta? It's the word, the use of the word renewal. How did — Because what was — because this is an omissions case. This is not — that doesn't exactly go to the thrust of my question. Okay. The thrust of my question is, how can something that the company didn't do deliberately, whether deliberately or not? So you — I'm using your term, I believe. And I'm — what I said was not — whether or not it was deliberate was the use of a particular word. You're still missing my question. If it's not deliberate, how could it manifest the intent or reckless disregard — Because what was intended — Can you let me finish my question? Let Judge Duncan finish her sentence, please. I apologize. I apologize. Thank you. A question just — your formulation, I think you would acknowledge, at least raises the question of how something that was done, deliberately can manifest the recklessness or intent to deceive required for Sienta. And that's the focus of my — my question goes to Sienta, not misrepresentation or mischaracterization necessarily. Well — But the intent underlying it. Okay. So what was deliberate was not telling investors that the contract was 125 miles away, they were going to have to start from scratch, and that there was going to be a hit to the company's bottom line. That was what was deliberate. And I can explain that as I go on, if I may. It seems to me that you're trying to construct a suit by just parsing to a fare-thee-well this one word, renewal, and constructing a whole web of deceit and deliberateness and the rest. And what concerns me, I think, the best I can tell, is what is concerning the Supreme Court, because it's Taleb's decision has simply not translated into the lower courts the way it should have. And Taleb's goes along with Rule 9 of the Federal Rules of Civil Procedure, which demands a heightened pleading standard for fraud. And what the Supreme Court, by requiring not just a plausible explanation but a cogent explanation, is they are very concerned that this whole idea of securities fraud is going to slide into some sort of negligence inquiry and is going to, even worse, slide into some sort of respondeat superior idea of when there are suits against the CEO and the CFO as there are here. And there's a real danger, and I think this is what Taleb's is signaling, that there's a real danger that every time an investment doesn't pay off, there's a suit to extract a fraud settlement. And that's the danger that Taleb's is pointing out, because there are investments all over the place that don't work out the way the investors want. That's just inherent in a market. But that doesn't mean that you can extract the worst possible motives, which is what Sienta implies, and I think what Judge Duncan's, it's more than an inaccurate. It's something more than something that's inaccurate. It's knowing deception. That's exactly right. Or recklessness. And just sort of chewing this word renewal to a fare-thee-well seems to me to be a thin reed. It's really not the word renewal so much as what renewal required once you use it. Once you use it, this is a classic misrepresentation under the statute. This is you make a statement and then you don't say something else that makes what you said not misleading. So here you have the word renewal. And by using the word renewal, it has a kind of ‑‑ It wasn't a renewal. It was not. Excuse me. It was not as if the relationship between Power Secure and Florida Power & Light was broken off. It's not that there wasn't a successor contract. There was a different contract. I mean, there was a contract. A renewal of a contract wouldn't suggest necessarily to a reasonable investor that the contract renewal would be on the exact same terms. But the point was there was still a continuing relationship between Power Secure on the one hand and Florida Power & Light on the other. There was, in fact, a contract renewal. Your Honor, I respectfully disagree, and here's why. Because it was 125 miles away, they were going to have to start from scratch, and it didn't matter, frankly, whether it was with Florida Power & Light. It didn't matter whether it was Florida Power & Light or some other company because it was as if it was a completely new relationship. And Mr. Hinton knew when he actually ‑‑ he's the one who ‑‑ and I'd like to read one sentence, if I may. And this is what the company says pre‑class period. They say it with regard to an SEC inquiry about pre‑class period filings. They say, quote, Our chief operating decision maker is our CEO who makes all final decisions with respect to the allocation of resources in our company. We do not operate the business with an operating committee or through divisional business heads. And no one disputes that Power Secure had only a small number of large contracts and during the May 2014 conference call, Hinton explained what had only ‑‑ Are you saying that Hinton had knowledge of the costs associated with the FPNL contract at the time he made the alleged misstatement? Absolutely. Okay. So where is that alleged in your complaint? Well, it's alleged by the fact that we allege that he made all final decisions with regard to the allocation of resources. His question was a little more specific than that. Right. And I'm doing my best, Your Honor, to answer it. So if he made all final decisions with regard to the allocation, he knew they were going to bid on ‑‑ Your argument is that he must have known. Not exactly. It's that he knew that they had bid for West Palm Beach. So what paragraph do I need to look at in the complaint? Excuse me a minute, counsel. You're not giving the members of this panel a chance to speak and to complete their sentences and ask their questions. Now, I'm going to ask you to hold off until Judge Thacker has finished saying what she's going to say. Okay. I'm sorry, Your Honor. In the complaint, what paragraph or paragraphs should we look to to find your allegation that Mr. Hinton had the requisite knowledge? Well, paragraph 39 is one spot where it's clear that he had the requisite knowledge because he knew that they were going to be bidding for a contract in West Palm Beach, and he knew they were going to be bidding for a contract in Fort Myers. And so if he's the one who makes the allocation of all resources of the company, we have CW1 who states that in May 2013, Mr. Hinton closed. He made the resource allocation decision to close West Palm Beach offices. So he knew that he didn't need those offices anymore because he had no contract. So what he also knew is he had a contract 125 miles away, just like he explained. It's like having a contract in San Francisco. That's a lot to read into paragraph 31 that I've just read. Thirty-nine, Your Honor. Oh, okay. Let me read 39 then. And also, could you please, what I'm trying to grapple with is there appears to be a blurring of the line between a sufficient pleading of misrepresentation and a sufficient pleading of scienter. So if you could line up your allegations for purposes of both those discrete elements. Well, Judge Deaver already found this was a material misrepresentation. You do realize that. Okay. And in doing so, what he found is that any investor would want to know about these operational inefficiencies and these costs in servicing what was, in effect, a new contract, despite whether it was with Florida Power and Light or somebody else. It was the fact that there was this contract that somebody called a renewal, which would suggest that you're already going to enjoy the efficiencies that have been achieved in servicing that contract in the past. You do realize that you're not going to my question. Judge Deaver, as it is correctly pronounced. I apologize. I'm asking where, so what are the distinct allegations with respect to misrepresentation and scienter? Well, the misrepresentation is that. And it seems to me as though you're equating the two because you keep going back to misrepresentation. You've never touched the part of my question that went to scienter. Right. So scienter is, did Mr. Hinton know that there were going to be these operational inefficiencies with regard to the contract that was in Fort Myers? And, yes, he knew that because he knew it was 125 miles away. That's what his reference about California and San Francisco versus Los Angeles. He didn't fess up until the end of the class period. So it was the, what he knew was that because, and he was responsible. But none of that is contained in paragraph 39, which you directed me to when I asked about his scienter. Well, 39 goes. None of those words. I'm sorry. I apologize. Go ahead. I did it again. Go ahead. So paragraph 39 goes to explain why Mr. Hinton knew everything about this company. He's the one who made the decision what contracts to bid for. And, in fact, at 703 of the record, he says, the contract structure doesn't lend itself to a company our size. There's just too much investment in working capital. We have to pick and choose how many of those we invest in. At the same spot in the record, he said, all contractors need stability in geographies. This is a suit against the CEO. And the company. But a lot of it's directed at Mr. Hinton. He's the chief actor in this. Now, the opposing side makes the point that this contract amounts to 4.1% of Power Secure's total revenues. And the question is, to what degree Mr. Hinton was put on notice. And this seems to me like what you're alleging is sort of a variation of the core operations doctrine. Well, it's not exactly that, Your Honor. What this is is that they knew. I thought you were saying that this was sufficiently important that it was a core operation of such that it was sufficient to put the CEO on notice. Well, he was the operations. He made all resource allocation decisions. But this is a contract that amounts to, at least as the opposing side indicates, 4.1% of Power Secure's total revenues. And the whole point of the core operations doctrine is that something is important enough that it automatically puts the CEO on notice. And what concerns me is that this complaint is trying to push this court into an outlier position, in effect, with respect to core operations that suffice to put a CEO on notice. And so in preparation for this case, I went through and looked at all these core operations cases. And you get one out of the Central District of California, which says contracts accounting for 20% of business were not sufficiently core. And some of these were in closely held corporations. They're not just all large corporations. But the courts are making statements like courts applying the core operations doctrine, and again, many of these cases are in closely held corporations, have generally required that the operation in question constitute nearly all of a company's business before finding Center. And in another case, in their legion, another case saying that a line representing 16% of a company's business was not sufficiently core. And the district court out of the Southern District of New York says plaintiff has made no showing that Macy's business was essential to Liz's corporate survival. Indeed, history has shown it is not. And therefore, even if the core operations doctrine were still viable, it would not give rise here to a strong inference of Center. And so in effect, you know, I know you can point to say, well, no, the individual circumstances, this corporation is different, et cetera, et cetera. But the courts are pretty consistent in holding contracts that constitute a far larger percentage of business than is evident here, not to be core operations to the extent that they can put a CEO on notice to the point that every statement is not only in this representation, but goes farther and is active Center. And that really puts out court among, there are other parts of your complaint that would put us in even more of an outlier position. But this initially puts us out of line with a host. Admittedly, they were district court decisions, but they're all over the country. May I address that, Your Honor? Yeah. So first, a matrix was decided by the Supreme Court and pretty much did away with that and said it's qualitative, not quantitative. And in this particular case, what happened was there was a conference call on May 7th, 2014. And during that conference call, if you read the transcript carefully, what you'll find is that the analysts asked mostly about the Florida Power and Light contract and the location shift. And immediately after that conference call, what happened? The stock went from $18.60 down 62% to $7. And so if that's not important enough to warrant stockholders wanting to know, I mean, then I don't know what is. Well, so if there was Center here, and this person was actually up to something, deliberate deception. During the class period, he didn't sell any stock when the price was at a class period high. And the sale that you hone in on, which was the August 21st, 2013 of his stock, he divested himself of 32% of his holdings. Now, if there was going to be Center, why wouldn't you unload it all? Or why wouldn't you unload a much greater percentage of stock than what he did? And the reason I point that out is because, again, courts from all over the country, including the Ninth Circuit, which is the most receptive to this sort of claim, have said that a divestment of far larger than 32% was not sufficient to raise suspicious circumstances of Center. And you've got three Ninth Circuit decisions saying something like Moore sold only 37% of his total stockholding during the class period. We typically require a larger sales amount, corroborative sales by other defendants, to allow insider trading to support Center. And again, the cases are legion. And they're both district and Ninth Circuit decisions. So in addition to the core operations doctrine, the amount of the executive stock sale that you would hold sufficient to constitute Center places us at odds with about 12 other courts. Your Honor, may I address that? Mm-hmm. First of all, that goes to motive. And you don't really need motive to show Center here. There's just no question that Deaver – I'm sorry, Deaver – that Hinton knew that these expenses would be incurred in connection with the new contract. But as it goes, he made $3.22 million more than he would have made if he sold it after he revealed this information, and it went to seven. The company made almost $30 million more, and he got a credit toward his divorce obligation of $2.5 million instead of a million. But it goes to motive. It doesn't necessarily mean that he didn't know, but it does support it. It's why there's a holistic view of all this, everything taken together. And the fact that he didn't sell it at the class period high – to point out to you, which is the amount of the company's business that is taken up with this contract, the amount of divestment of his assets, the fact that there were no sales on the part of Hinton when the price was at a class period high, the fact that decreased operation – increased operation expenses and deteriorating gross margins were all disclosed, to say that we're not taking a holistic view is just wrong. Your Honor, I'm way out of time and have no time left. You have some rebuttal time. May I preserve that, or do you want me to – I mean, I've addressed what I believe is the answer to your question. I'm glad to try to do it again, and that is that I think if you look at this as a total picture, what you have is you have a CEO who is the person who decided what contracts to bid for, a CEO who knew he had at the same time lost West Palm Beach and gotten Fort Myers. It was 125 miles away, and he had to find – he had to basically start from scratch. He knew it was going to take a hit on the bottom line of the company. It actually did cause a hit on the company. There's no doubt that he knew this. You're assuming a conclusion. There's no doubt he knew it. It's because he's the one who made every decision with regard to how that company invested money. I read to you how he said each contract – we only have a few contracts, he said. Each contract was a separate investment decision, so he's making the decision, okay, I'm going to invest in the potential of getting Fort Myers. I'm going to invest in the potential of getting West Palm Beach. He didn't get West Palm Beach. Had he gotten West Palm Beach, it would have been renewal. You are way over your time. May I say one more thing? No, you've got the rebuttal time. You've reserved a large amount of time for rebuttal. Thank you. Mr. Watts. May it please the Court, I think at this point one might ask, a case that involves a 4.1% customer, how can that have the outsized importance that plaintiffs place upon anything said about that customer for the total revenue, total profitability of a much larger corporation? I think the response to that, and I take the point of your disagreement, but the stock price declined by more than 62% after Hinton acknowledged that they had incorrectly guessed the rhythm of how the work was released. So I don't know that you can hang your hat on the totality, given the impact that the statement had on the stock price when it was made, or at least you have to factor that in. I think you're exactly right, Your Honor. I do not hang my hat on that. In fact, I do want to point out that the reason why we're here is because in the initial complaint, plaintiff alleged 26 alleged fault statements. Judge Dever dismissed 25 of those 26, leaving only one, the statement in the use of one word, renewal, orally by the CEO in a conference call. So when the class parade ends in May of 2014, the truth coming out was not about Florida Power and Light only. There was a sea of information that came out on that day that was far more negative and far more important to the company than Florida Power and Light. And plaintiffs are asking the court to effectively put on blinders and ignore the real market-moving information on that day. And it's in the record. And I'll read the four main reasons why they had a disappointment in the first quarter of 2014. Raise your hand. Sure. There you go. Apologize. Number one, on May 7, 2014, the company disclosed they were reducing their revenue guidance for the entirety of 2014, the rest of the year, the next three quarters. Why? Because they had a huge backlog drop exiting the first quarter and entering the second quarter. They were worried about revenue, company-wide, not Florida Power and Light. Number two, they disclosed that their equally large business unit, distributed generation, was 41 percent of the company, that their sale cycle had lengthened dramatically and, therefore, their sales were dropping off. Number three, they said they had moved crews to a job in Texas for another company called Encore, and those crews didn't have the work to do because the customer didn't order the work they expected them to order. And then number four, they said there were, quote, inefficiencies in the utility infrastructure business unit, of which FP&L, Florida Power and Light, was only a small percentage, 10 percent. Could I ask just one focused question that would help me a great deal? Mr. Piven focused extensively on the extent of Mr. Hinton's knowledge. My concern is with introducing an equivalence between knowledge and culpable state of mind. Do you think that the two are equivalent or distinct, and if so, why? I think that the standard is that plaintiffs must show a compelling inference that Mr. Hinton either knew or was deliberately reckless in not knowing that the use of the word renewal would mislead investors. I don't think that anywhere in their case has he gotten to that point and reached that threshold. That was going to be my other question. Do you see specificity in the complaint with respect to that? And I believe Judge Thacker explored that with Mr. Piven and may try again on rebuttal. I find it puzzling because they're trying to pack so much meaning into the word renewal that somehow they believe that shareholders should have been hearing a dog whistle that when he said Florida Power and Light was a renewal of a contract, that that had great importance to the company as a whole, to the company's revenue as a whole, to the company's profitability as a whole, even though it was a mere 4.1 percent of the company's revenue. But the knowledge, it's not enough that the knowledge goes to the existence of expenditures. To show scienter, you have to show that the knowledge goes to the intent to deceive, correct? Correct. It's not focused on purely factual phenomena. It is the use of those phenomena to induce action on an inaccurate basis. That's correct, Your Honor. Mr. Hinton must have either known he was misleading investors or have been severely reckless in making statements that he should have known would have mislead investors. So one of the things that you're pointing out is that this company disclosed all kinds of adverse information, made public all kinds of adverse information, including not only declining profit margins, but things that were going wrong with specific business relationships and with specific clients. And that adverse information was made public, at least as I understand when you ticked off those four factors which build upon your brief, that was one of the things you were trying to make. This is not a company that is covering up bad news. That's correct, Your Honor. In fact, if plaintiffs were trying to hide the impact of Florida Power & Light on the company's overall profitability, they did a horrible job of it because they hid it in plain sight. How? Well, I'll tell you. When Mr. Hinton spoke to start the class period in August of 2013, in that conference call statement, the company disclosed that its gross margins were going down that quarter from 30.6% to 28.3%. And then every quarter moving forward on a timely basis, every quarter during the class period, the company disclosed lowered gross margins over that time period. But this isn't really a merits inquiry, is it? And this comes to us on a motion to dismiss. And so what Judge Dever found is that the appellant sufficiently alleged misrepresentation, at least with respect to one instance, but did not sufficiently allege the components of C&M. Correct. And the reason I pointed out the gross margin declines over the class period is that goes to C-enter, not to falsity. And that is that if you're going to lie to people, but at the same time tell them the big truth, it's not working very well. They were disclosing what mattered most to plaintiffs, which was the company's profitability, the company's gross margins, throughout the entirety of the class period. Now, you know, there's no reason why the investors in Power Secure had to sit in the lotus position and think deeply, ponder deeply, the meaning of the word renewal. Because they got the information. Go ahead, Your Honor. All I was going to say is I do think it's important, the point that this is not a merits inquiry into the accuracy of a representation and that there simply cannot be a conflation between misrepresentation and deception. And the reason is you go back to word C-enter. The word C-enter is essentially derived from the law of fraud. And the law of fraud never has allowed an innocent misrepresentation by itself to complete the elements of that cause of action. The law of fraud requires an intent to deceive and an intent to induce reliance. And absent that intent, you don't have a case. And that's where the word C-enter derives from. It derives from centuries of the common law of fraud. And it's never been the case that an innocent or even a negligent inaccuracy would expose somebody to a fraud suit. And so this is, and to conflate those two just makes a mockery of the telehab's case and draws us back into a negligent standard. And even worse, a kind of a respondeat superior situation where the chief executive officer is liable for every inaccuracy, is charged with every bit of knowledge, and no court's ever bought off on that kind of expansive interpretation of core operations or the percentage of executive sales or whatever as indicia of C-enter. So the indicia of C-enter that's brought forward here are simply the kind of things that courts across the country have deflected. You're exactly right, Your Honor. And in fact, what you just said reminds me of one of Your Honor's decisions, the Cozzarelli v. Inspire Pharmaceuticals case. It was a case my law firm actually handled a few years ago. And I think that decision, quite frankly, Your Honor, is very instructive on how this court should view this case against power of security of Mr. Hinton. And I'll explain why. In Cozzarelli, the plaintiff alleged that the CEO used the phrase corneal staining instead of the word corneal clearing when describing its primary end point for its clinical study for the treatment of dry eye disease. The plaintiff alleged that the word staining was misleading because it led investors to believe that the end point was far more achievable than it actually was, because the end point was actually corneal clearing. So again, this is a case about one word, staining versus clearing in the Cozzarelli case. Here it's one word, renewal versus new. And they effectively said that it misled investors, thinking that the drug would be approved because the study would be successful. Now, in Cozzarelli, very importantly, this court presumed falsity, presumed materiality, and dealt only with Sienter, as we're talking about here today. And in that decision, the court found that plaintiff still failed to plead a strong inference of Sienter, quote, because it was difficult to infer intent to deceive from the use of one word instead of another. And that use of the word staining instead of clearing supported, quote, at most an inference of imprecise or even negligent use of language, not an inference of Sienter, close quote. But I think, again, the critical point is the one my colleague raised, and that is if you conflate misrepresentation, the mere fact of a misrepresentation with Sienter, you upend this entire area of law. You turn it on its head. It becomes a totally different, and all the safeguards against extraction suits are leveled. I mean, I completely agree, Your Honor. I mean, they are separate elements of a claim of securities fraud. To conflate the two reads one element out of the statute, out of the law, which is totally inappropriate. And I think that's why Cozzarelli is so useful, because in that case, the court clearly cleaved the areas into false immateriality on one side and Sienter on the other and discussed merely Sienter in the entire decision. And, you know, like Cozzarelli in this case, plaintiff alleges that a single word uttered by the CEO was misleading. Like Cozzarelli, plaintiff alleges that that word misled investors to think that the prospects of the project for Cozzarelli it was a drug, for them it was the profitability of a contract with FP&L, was more likely than not. In Cozzarelli, plaintiff alleged the CEO must have known the study would not achieve its actual primary endpoint. Here, plaintiff similarly alleges that CEO Hinton must have known the Florida Power and Light would not be profitable. Now, like Cozzarelli here, plaintiff also alleges corporate motive to raise capital and an individual motive to profit from the sale of stock. Now, in fact, this case is more deserving of dismissal than in the Cozzarelli case for the following reasons. In Cozzarelli, you know, the word staining had one meaning and clearing had another. Here, the word renewal has multiple meanings. We know that plaintiff cites some definitions, defendants cite another. Now, there's no reason for this court to conclude who has the better definition at this stage. What the court can conclude, however, is that because of these multiple meanings of the word renewal, one can't find Mr. Hinton in using that word was severely reckless or intending to deceive investors. In Cozzarelli, the disclosure that they had not met their primary endpoint, which was corneal clearing, not corneal staining, was the only market-moving information that day to end their class period. That is not the case here. As I just mentioned earlier in my argument, there were many other reasons disclosed by the company as to why they were having disappointments in that quarter and for the rest of 2014, unrelated to Florida Power and Light. Judge Thacker, during my opponent's opening argument, talked about the signals that were given to the investing public by the company as the class period started about gross margins moving forward. And in fact, I want to quote for the court. On that very conference call, the plaintiff alleges started the class period, August 7, 2013. The company said, and I quote, gross margins would be even lower in the next couple of quarters due in part to the continued growth profile of some of our lower margin utility infrastructure business, close quote. Not only did they tell them real time throughout the class period, they actually projected for investors to expect lower profitability moving forward in that sector involving Florida Power and Light. What more could they have done? They projected it. Then they updated the market every quarter throughout the class period. This is not an intent to deceive. This is not an intent or severe recklessness in deceiving investors. Thank you, sir. Thank you. Starting with the August 7, 2013, conference call, the statement, well, first of all, August 7, they were dealing with second quarter results. And so when they, it's pure misdirection to talk about something that hadn't happened yet because the renewed contract, the contract that was in Fort Myers, not in West Palm Beach, hadn't even started yet. So these increased costs couldn't have been attributable to that because it was a different place. But what I would like to do is try to explain why in this case misrepresentation and scienter are linked. Not the same thing, but linked. Because what Judge Dever found is given the relatively small number of contracts that Power Secure worked on, a reasonable investor might find the distinction between the two as having significantly altered the total mix of information. Because the new contract would require a significant investment in hiring and training new personnel and lead to underutilization of existing personnel. So if a reasonable investor would know that, and a reasonable investor includes lay investors, if a reasonable investor would know that, then Hinton, who knew everything about this business, had 30 years of experience, made every decision regarding allocation, of course he also knew it. He had to know it. They used the word renewal four times in writing. It was once used in the 8K that was filed on June 6th. And then it was used, I'm sorry, it was used twice in the 8K. Then it was used, I'm sorry, once in the 8K, twice in the press release that was attached to it. And then it was used on August 7th in the 10Q. Who signed the 10Q? Mr. Hinton signed the 10Q using the word renewal. Those documents that are in writing and filed with the SEC, they are crafted, not drafted. The words were carefully chosen. And so you don't use the word renewal in a writing that's reviewed by lawyers and all that if you're not intending to deceive. This would be a different case if the relationship between the two parties was somehow broken off and he was projecting a renewal and then there was no future relationship between the parties. But here there was. Now the parties quibble over what renewal means. And you say renewal implies that it was exactly on the same terms. And then they, yes you do. And then the opposing counsel says no, no one would expect a renewal to be on exactly the same terms. And then there's a question of the semantic difference between renewal and extension and all the rest. But in this sort of flurry of words and analysis of semantics, the question is whether you can extract from that an intent to deceive. And Judge Dever refused to conflate what you just read with an intent to deceive. And that was his bottom line. But how could a reasonable investor know it and not Mr. Hinton? That's why in this particular case it does equate. And respectfully, Your Honor, we never ever anywhere in our papers suggest that renewal means the same terms. We do not. And really the word renewal, if they had used the word new contract, then we wouldn't be here. But the reason we're here is because this is an omissions case. This isn't an affirmative misrepresentation. And Judge Dever doesn't actually find it's an affirmative misrepresentation. He finds it is an omission. That by using this word, that even if it's ambiguous, if it's an ambiguous word, it still needs to be clarified because it does have two meanings. So if it has a meaning of renewal or a renewed relationship with an existing, it's something that obviously investors would have found important and would have affected the total mix. So once you create that ambiguity, if that's what it is, then you have the affirmative obligation to make what you said not misleading. And the way you make what you said not misleading is to say, but this renewal or whatever you want to call it, this renewed relationship is for a location that is 125 miles away and we are going to have to start from scratch as if it's a new customer. Because that's what this is. It really doesn't matter that it's Florida Power & Light. It matters that the contract is in a completely new location, that the startup expenses are going to eat into the profits. And in this particular case, very, very significantly impact the potential of the profitability of the contract. And it's not speculation anymore and it's also not fraud by hindsight to say this, but we know what happened. We know what happened. And that conference call in May of 2014, the analysts weren't asking about all these other things. What they asked mostly about was the Florida Power & Light contract. They asked mostly about the geographic shift. They asked mostly about why that, you know, and Hinton was very apologetic at that time. He fessed up. He was doing a mea culpa. And if you read that transcript carefully, you'll see that's exactly what he was doing. But there's no debate whether he knew at the beginning of the class period that when he adopted the word renewal, he was misleading investors because he didn't also say, by the way, we're going to be starting from scratch with this. Excuse me one second. How much time has elapsed out of the seven minutes? The orange light is supposed to come on. It just hit. Okay. Right at seven minutes it just happened. Okay. Go ahead. I mean, I really, unless the Court has other questions, I think I've really hit everything. I mean, this is, these additional. Counsel, I think we understand both sides of the argument, and I think we understand your argument. Thank you, Your Honors. We'll come down and brief counsel and then we'll move into our next case.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, Stephanie D. Thacker